Please permit me to thank this court for reinstating the appeal of Ms. Antelan. The appellate appreciates this opportunity to be heard on the merits of her appeal, at least giving her her day in court before this court. In this appeal, appellate requests another opportunity to have her case further heard at trial before a jury. Accordingly, appellate respectfully requests that this court reverse the order denying plaintiff's motion for trial by jury and the order granting defendant's motion for summary judgment. If you please the court, I wish to proceed this morning by first addressing the summary judgment issues, more particularly attempting to clarify those issues and to state them more simply and in much broader terms to provide a framework for this court. Secondly, I would then like to address particular points of law that appear to be in dispute, first with regard to the preclusion issue and secondly with respect to the preemption issue. Then I would like to proceed to address the matter of trial by jury. And if time permits, I wish to then speak briefly upon the specifics of the disability discrimination as well as retaliation. So if I may proceed. Sure. First with regard to the matter of summary judgment, as I mentioned before, I would like to attempt to clarify the issues with regard to this particular matter on appeal. For providing a broad framework in general terms of the issues before this court with regard to this particular matter. With regard to this matter of summary judgment, appellate respectfully requests that this court reverse that summary judgment as a result of errors of law, which in turn led to faulty findings of fact. That is facts in dispute. Stated otherwise, without these errors, there are genuine issues of material fact for trial. Put it simply, these errors of law regarding these claims of discrimination in terms of national origin as well as disability and to some extent even the issue of the matter of retaliation. Perhaps it would be helpful if you could explain exactly what facts you believe there are that make out from a facial showing. First with regard with regard to the national origin discrimination claim. This record below in his summary judgment order with regard to the matter of job performance. This record found that. This uncle on did not have a satisfactory work history. Well, yes, but but before before you even get there. What facts do you think that there are in the record which shows that she was treated differently on account of being Filipino. With regard to that particular matter, which gets to the issue of being singled out and treated less favorably. We were below. We provided evidence with regard to. In the first instance, the class action union grievance. Filed by the Filipino will be Texas. They're called in this grievance. The claim was that non-Filipino LPNs licensed practical nurses who did the same work or similar work. So we're given longer hours of work and therefore more paid. On the other hand, the Filipino will be Texas. They're called were placed on an alcohol and on call status. Now, this particular matter needs to be viewed against the backdrop. Of this union discrimination claim filed by the Filipino will be text. All of this leads up to the incident of November 27th, 1998. And the appellate Miss Antolon was one of the prime movers. One of the most outspoken advocates of this particular grievance. Going back to the incident of November 27th, 1998. Ironically, the incident was first reported by appellate. Which, of course, led ultimately to her termination. The investigation started off innocently enough about a supposed insubordination of the appellate. With regard to not following certain orders from her supervisor about opening boxes of gowns in patients rooms. Then the investigation escalated. Investigation in turn, instead of focusing on the alleged incident. But began to be focused on Miss Antolon herself, personally. As a result, the investigation delved into allegations of her threatening behavior in the past. Not only at work, but also at home. All of this while the appellate was on leave for workers compensation claim for stress. As a result, of course, of that November 27th, 1999 incident. This was the complete context and the full background against which the incidents that occurred at work. Led to, first, to her leave, the leave without pay status. And ultimately, of course. What was the outcome of that grievance, that group grievance of the LPNs? At the time that the case was filed and the time that Miss Antolon was first put on leave without pay, as well as terminated, was still pending. Ultimately, that grievance, as I understood it, was dropped by its wayside by the union. Largely because Miss Antolon was not at work at that time. Now, if I may return. Well, what was the evidence that she was the target of retaliation? The target of retaliation. Did the management treat her as the ringleader of this grievance or something? It appears to be that way, Your Honor. What was the evidence of it? The evidence for that is she was the one who initiated the grievance. She was one of the signatories on the grievance. With regard to the overall matter of retaliation, if I may address that particular point. That this claim, of course, is with regard to the retaliation against Miss Antolon for her protective activity. Of course. The adverse action being her termination. Was she the only one of those LPNs that was terminated? Correctly. Yes, Your Honor. That, of course, gets to the issue of the causal link between the two. The protective activity on the one hand and the adverse action on the other. And as jurisdictions everywhere have maintained, a temporal connection is appropriate or sufficient. This is longer than any other case is ever recognized, however. With due respect, Your Honor. Even in the recent Supreme Court case, I believe, there the court had cited two examples of retaliation. And period being anywhere from four to six months. If I may return to the matter of the errors of law. In a nutshell, these errors of law go to the matter of a higher standards of proof on a burden of proof issue. These higher standards, in turn, relate to evidence. More particularly, on the one hand, the nature of evidence, or as I call it, the simple type or kind of evidence presented in support of a prima facie case now. Secondly, goes to the quantum of evidence, or what I simply call the amount of evidence. The district court used a much higher standard than is allowed in this jurisdiction. In its order, the district court called for more direct evidence. Similarly, with regard to the matter of the quantum of evidence, the district court required substantial factual evidence, even to the point of declaring the requirement of more persuasive evidence than otherwise necessary to show there is a genuine issue for trial. As this court is well aware, the authorities in this jurisdiction allow for, with regard to the nature or the type of evidence, circumstantial evidence supporting an inference of discrimination. With regard to the quantum or the amount of evidence, the law in this jurisdiction requires not substantial evidence, in fact, minimal evidence or very little evidence, and even evidence that does not tend to rise to the level of the preponderance of the evidence. This court has even stated any indication of discriminatory motive is sufficient. And these standards of the burden of proof serve as a screen work through which evidence is to be filtered in viewing a claim for discrimination, especially in a context for a motion for summary judgment, where the evidence must be viewed in the light most favorable to the non-move on, in this instance being the appellant plaintiff, Ms. Antolon. If I may now proceed to what appears to be a few points of error that appear to be in dispute. First, in particular, addressing the matter of the preclusive effect of the administration and administrative decision. And this is a critical issue going back to your Honor's question with regard to the evidence in terms of, in particular, the job performance of Ms. Antolon. In this regard, appellate takes exception to the reading of University of Tennessee v. Elliot by appellees. It does not stand for the proposition that an unreviewed state administrative decision is not entitled to preclusive effect in a subsequent Title VII action. There, in Elliot, the administrative decision or procedure referred to is a university grievance procedure, where Elliot raised racial discrimination as a defense of his discharge. And, of course, he lost and then proceeded to fret a court on his Title VII claim. The court there went on to hold, in fact, when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it, which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled to in the state's court. I'm sorry, but I'm a little lost as to the import of this on this case. The import of this matter with regard to the preclusive effect of the administrative rule goes to the very issue of the alleged unsatisfactory work performance of Ms. Antolon. In particular, appellate relies upon the unemployment insurance benefits that were awarded to her for which the administrative agency, in particular the State Department of Labor, and particularly the unemployment insurance, found that she was not terminated for any misconduct, meaning she was not performing unsatisfactorily. She was not fired for the alleged insubordination or the threatening behavior. Therefore, this decision with regard to the unemployment insurance benefit must be entitled to preclusive effect. Or must not, excuse me. I understand. Thank you. At the very least, this should be persuasive evidence. Well, putting aside what the workman's compensation hearing outcome was. The unemployment insurance. Excuse me. Unemployment insurance hearing was. Would you give me your views as to why Hawaii state law doesn't preclude her claims for emotional distress? That gets to the very issue of preemption, of course, other than that labor management relationship. Well, in part, but in part not. Because assuming it's not preempted, then why does her claim survive under Hawaii state law? Hawaii state law. In other words, why is it unreasonable or outrageous? And did she suffer any physical injury that would support the claim for negligent infliction under Hawaii state law? With regard to the issue of outrageousness in particular, Your Honor. Appellate, of course, relies upon the use of. Number one, criminal records of Ms. Antillon by her former employer. And number two, of course, the psychiatric reports of Antillon. Both of these touch as well upon, of course, our invasion of privacy claim. Well, let me clarify something on that. I understand that from my reading of the record that there was a stipulation entered into that the privacy claim was based on the violation of the Hawaii Constitution. Well, with regard to that, Your Honor, the intent there was to simply cite the constitutional article as an example of the type of it. It wasn't to say that that's the claim that was being pursued? We never intended to attempt to discover any state action on the part of the former employer. I understand the Court's thinking on that point, and if that be it, we will proceed accordingly. Going to the matter of preemption, though, again. This Court has held that a claim is not preempted if it does not threaten significantly the collective bargaining process, if it furthers the state interest in protecting the public that transcends the employment relationship. Even the U.S. Supreme Court in lingo has said preemption only applies if resolution of a state law claim requires, and I emphasize requires, interpretation of the collective bargaining agreement. Here it does not. So as a matter of law, the claims for emotional distress cannot or are not preempted by the Labor Management Relations Act. Since I see my time is running short. Would you care to reserve the remaining time for rebuttal? Very briefly. Sure. I would simply like to address the matter of trial by jury. In its answering, the appellate, of course, refers to Pacific Fisheries, the HIH Casualty and General Insurance Company. I simply point out to the Court that that decision or opinion was filed in February 9, 2001. The motion for trial by jury, in turn, was filed in November of 2000. The hearing was held in December of 2000. The order was issued in April. In other words, prior to Pacific Fisheries, the so-called some cause beyond mere inadvertence as a test for the exercise of discretion of a district court in granting a motion to suffer subject was not the law at that time. That's all I have to say at this time, and I will reserve a minute and a half. All right. Fine. Thank you. Ms. Wang. Thank you, Your Honor. Sarah Wang here, representing Kapi'olani Medical Center for Women and Children, the defendant and appellee in this matter. I would like to hopefully very briefly recap the facts of this case that have brought us here, because I think that they do help to analyze the claims that we have at issue, and then address some of the points that Mr. Fujiwara brought up on his opening statement. Ms. Untulan worked as an obstetrics technician, or as we've been using the shorthand OB-TECH, in the family birth center of Kapi'olani Medical Center for Women and Children. That means that she had direct patient care responsibilities for pregnant mothers and newborns, as well as close interaction with other employees and hospital staff. Women and Children learned of an incident that occurred in November of 1998, with an immediate supervisor of Ms. Untulan's, Chris Turner. In the course of that investigation, Kapi'olani Medical Center learned for the first time of threats that Ms. Untulan had made to kill the LPNs. Also learned from employees who were interviewed in the course of the investigation that Ms. Untulan had recently talked about having guns in her house, and having access to guns. Kapi'olani Medical Center for Women and Children also heard from the employees who expressed personal fear of working with Ms. Untulan, of very recent, tense, agitated, and short-tempered behavior by Ms. Untulan. The hospital concluded that it appeared that they had a serious breach of their rules, both from the insubordination aspect from the November 27, 1998 incident, as well as from the additional information of threats made on property against other employees. The hospital, of course, in accordance with its due process obligations under the collective bargaining agreement, confronted Ms. Untulan, who was accompanied by two union representatives, with their concerns and what they believed they had found in the course of their investigation. And very importantly, there was no denial by either Ms. Untulan or her union representatives of the conduct that Kapi'olani believed it had found to have occurred. And as of this day, notwithstanding a deposition that Ms. Untulan testified in, as well as an affidavit that she submitted in opposition to Kapi'olani's motion for summary judgment, has there been any denial by Ms. Untulan of that underlying conduct? And I think that's an important aspect to keep in mind. Given that backdrop, it seems hard to fault Kapi'olani for coming to the conclusion that this undisputed conduct warrants termination. Under the circumstances and under the information that Kapi'olani had at the time, because, of course, this is a long-term employment relationship, and Kapi'olani was not acting in a vacuum, and it did have other information that the decision-makers in this case were aware of, and that, frankly, I think Kapi'olani would have been remiss not to take into account in one way or another. Having found that termination was warranted based on what Kapi'olani considered to be a very serious breach of its house rules, Kapi'olani nevertheless felt that it needed to consider or take into account a warning it had received in an IME report in the course of a prior workers' comp proceeding where Ms. Untulan had gone out on a stress claim. In the course of that proceeding, an initial IME was done, which disclosed violent fantasies of taking a scalpel and slitting her supervisor's neck, which led Kapi'olani, before bringing her back to work, to send her to a second IME to assess fitness for duty. That second IME was received in March of 1998, a few months prior to this. That second IME, by psychiatrist Dr. George Bussey, recommended that if Kapi'olani in the future, that although Dr. Bussey did not consider Ms. Untulan to be an inordinate threat or risk to having her come back to work at that time, he specifically recommended that if in the future Kapi'olani was inclined to terminate Ms. Untulan for future violations of work rules, that Kapi'olani should at that time consider protective actions, including a temporary restraining order, because in his view, the constraints on her behavior that were leading her not to act out on her violent fantasies may be lessened at that time. Given that background, I think Kapi'olani understandably felt that it had no alternative but to at least consider that and to really think about the potential dire consequences of an outright termination. And in that context, I think that Kapi'olani's decision to offer her a conditional six-month leave of absence in January of 1999 as an alternative to outright termination, which it felt was warranted based on the recent conduct, Kapi'olani felt that offering that alternative was in the best interest of its patients and its employees. There's no dispute that at the meeting with Ms. Untulan and her union representatives, the union representatives expressed to the hospital that Ms. Untulan would accept the six-month conditional leave of absence and that the conditions were discussed at that time. There's also no dispute that Ms. Untulan subsequently decided she didn't like that alternative after all, but without notifying Kapi'olani of that fact, and that she did not in fact comply with the requirements on that conditional leave of absence. When Kapi'olani therefore looked at the situation, when she called and said, okay, I'm ready to come back to work now without having fulfilled any of the conditions, Kapi'olani's response was, wait a minute, the alternatives you had in January, the decision we made in January was to offer you the conditional leave of absence in lieu of outright termination. If you're not going to take or follow the conditional leave of absence, the alternative is termination, and that was effectuated in July of 1999. Since that time, Ms. Untulan has challenged both the decision in January of 1999 to make that conditional offer in lieu of termination and the July 1999 effectuation of the termination. She's challenged that twice in front of the Hawaii Civil Rights Commission. Both times, the Civil Rights Commission concluded there was no cause to believe that discrimination based on national origin, disability, or retaliation had occurred. She challenged the decisions twice in front of the National Labor Relations Board, which both times concluded that there was no evidence to substantiate her belief that those decisions were based on her protected union activities. She challenged it once in an arbitration, which found that Kapi'olani had just cause for both of its decisions under the union contract. And she's challenged it in two cases in the district court below, which have subsequently been consolidated into one case, which is the reason we're here today, because the district court, of course, found that the summary judgment on all her claims should be granted. With that factual backdrop, I'd like to address some of the issues that Mr. Fujiwara brought up, or whatever issues you would like to direct me to. Mr. Fujiwara initially talked about the national origin discrimination claim and talked about the evidence that he believes create a genuine issue of fact on that. I think that the description that Mr. Fujiwara gave of what some of these complaints are about really distorts what Ms. Untulan actually testified to. Ms. Untulan has testified repeatedly, and she's made statements in the documents that are in the record, that this is not really about Filipino and non-Filipino. This is about OB Techs and LPNs. She has specifically admitted that Filipino LPNs are also treated better than she is. She has also admitted that Filipino OB Techs are treated better than she is. Several of the names that she talks about and references as having been better treated than she does, Marlene Acuron, Adelia Dela Cruz, Richard Balmesita, Gregoria Carrion, she also admitted in her deposition that all of those individuals are also Filipino or of a Filipino national origin. I do want to mention, because it was discussed in Mr. Fujiwara's argument, that the class action grievance, the 1998 class action grievance that Ms. Untulan was a part of, I do not believe that there is any information in the record as to the outcome or the status of that grievance. On the retaliation claim, I think Mr. Fujiwara conceded that although they are basing the retaliation claim in part on this 1998 class, I'm sorry, 1997 class action grievance, that she was the only OB Tech who was a part of that grievance, who in fact suffered any sort of adverse action. And again, one would expect that if that were really the problem, having filed this grievance were the problem, that she would not have been the only one affected. Moreover, to the extent this really is about the prior class action grievance, I think we have a Garmin preemption problem as well. The causation issue, we've I think fully briefed our argument that the 5 to 14 months that we're talking about in this case is too long. In a case like this one where all you have is temporal proximity, that's the only argument for why there is retaliation, why there's a prima facie case of retaliation made out. And Mr. Fujiwara alluded to Clark County School District versus Breed in the Supreme Court case, which frankly postdates all of the cases that he mentioned in his brief. And I believe that most of those cases in the brief were shorter than the time period we're talking about here in any event. I do want to address, because Mr. Fujiwara relies in a couple places in his brief, on the alleged preclusive effect of the unemployment decision. And it's important to note that in this case what we have is we have a claims examiner's decision. There was no appeal of the claims examiner's decision that Ms. Entelang was entitled to benefits, to unemployment benefits. There was no evidentiary hearing. The claims examiner did not operate in a judicial capacity. The standard for finding misconduct under the unemployment statute and regulations is different than the standard in court for determining whether or not discrimination has occurred. Under the administrative regulation, misconduct for purposes of unemployment benefits is not defined to include every legitimate reason for a decision. It requires a finding of willful and wanton disregard of an employer's interest. And finally, in terms of a policy matter, I certainly do not think it would be a sound policy to encourage employers to fight every grant of unemployment benefits. It seems to me that what we want is we want employers who say, well, we do believe that it's appropriate to terminate you, and no matter how appropriate that is, we still are not going to hit you while you're down by fighting your unemployment, your ability to get unemployment benefits. And frankly, a lot of times the amount of unemployment benefits makes it not really an economic decision for a company to fight and to go all the way through the appellate level hearing. So I do not think that this court should accord any sort of preclusive effect to that unemployment decision. Could I ask about the procedural matter? Is the is the denial of jury trial moot? Because the if if the court was right in granting summary judgment, there wasn't anything for a jury to do. Did the court take any testimony on any disputed questions of fact on the summary judgment? Yes. Or did the magistrate hear any witnesses? No, no. The magistrate. This is all documents? Correct. Documents and then oral argument. That's correct. I think that the and I've briefed the issue and I don't want to just repeat what I know. I don't want to do that, but I just was curious about the position of the of the defense. The magistrate judge have a little more wiggle room on summary judgment if it's a bench trial. Oh, I mean, in terms of what they what they allow. I mean, whether any possible inferences are reasonable or not. Were you mean were to get to that point? No, no. On summary judgment, if it's a bench trial, doesn't the judge have a little more wiggle room in determining whether an inference is a reasonable inference? Because if it's a bench trial, the judge is going to be making that decision. Yeah, I think that's I think that's probably true. And briefly, very briefly on the privacy claim with respect to the stipulation that was brought up, I would refer the court to the supplemental excerpts of record at 17, which contains the stipulation itself, as well as the supplemental excerpts of record at 397, which contains counsel plaintiff's counsel's letter requesting that the constitutional claim be characterized as one of a violation of Article One, Section six of the Hawaii Constitution. And certainly the understanding that Kapiolani had is that that stipulation was meant to define the claims that were at issue in the case. I believe that we have addressed the question regarding outrageousness in our briefs. And unless the court has any questions, I don't have anything further to add. Okay. Thank you very much. Most briefly, Your Honors. Appellee has, of course, made reference again to the preclusive effect of the unemployment award benefit. And in conjunction with that, I was talking about the motive of the employer in dismissing or discharging Ms. Antoine. In this connection, I simply would like to point out the issue with regard to pretext on the disability discrimination claim. I believe all these different reasons or explanations for the firing of Ms. Antoine clearly points out the inconsistent motives on the part of the employer for terminating Ms. Antoine, as we have briefly addressed in our briefs. And I note that my time is up. Thank you very much. Counsel, thank you for your argument. The matter just argued will be submitted. We will hear next international health care management versus the Department of Health and Human Services. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Goodwin, Rymer, T.G. Nelson